## PHŒNIX INSURANCE COMPANY *v.* ERIE AND WESTERN TRANSPORTATION COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF WISCONSIN.

Argued January 19, 20, 1886.—Decided March 1, 1886.

The right, by way of subrogation, of an insurer, upon paying for a total loss of the goods insured, to recover over against third persons, is only that right which the assured has.

A common carrier may lawfully obtain insurance on the goods carried against loss by the usual perils, though occasioned by the negligence of his own servants.

In a bill of lading, which provides that the carrier shall not be liable for loss or damage of the goods by fire, collision, or dangers of navigation, a further provision that the carrier, when liable for the loss, shall have the full benefit of any insurance that may have been effected upon the goods, is valid, as between the carrier and the shipper; and therefore, in the absence of any misrepresentation or intentional concealment by the shipper in obtaining insurance upon the goods, or of any express stipulation on the subject in the policy, limits the right, by way of subrogation, of the insurer, upon paying to the shipper the amount of a loss by stranding, occasioned by the negligence of the carrier's servants, to recover over against the carrier.

This was a libel in admiralty against a common carrier by an insurance company which had insured the owners upon the goods carried, and had paid them the amount of the insurance, and claimed to be subrogated to their rights against the carrier. The defence relied on was that, by a provision of the contract of carriage, the carrier was to have the benefit of any insurance upon the goods. The District Court held that this provision was valid, and therefore no right of subrogation

accrued to the libellant, and entered a decree accordingly. The libellant appealed to the Circuit Court, which found the following facts :

The respondent was a Pennsylvania corporation, authorized to carry on the business of lake transportation, was engaged in business as a common carrier, and owned a line of propellers running between Erie and other ports on the Lakes, called the Anchor Line, one of which propellers was the Merchant.

On July 24, 1874, the firms of A. M. Wright & Co., owners of 16,325.34 bushels of corn, worth $8000 ; Elmendorf & Co., owners of 800 bushels of corn, worth $600 ; and Gilbert Wolcott & Co., owners of 370 bushels of corn and 689 bushels of oats, together worth $800, caused to be shipped on board the propeller Merchant, then lying at Chicago, and bound for Erie, the grain aforesaid, consigned to themselves at other places beyond ; and severally made oral agreements with the respondent, by which, in consideration of certain stipulated freight, the respondent agreed to transport the several parcels of grain from Chicago by way of the Lakes to Erie, and thence to forward them to their ultimate destinations ; and it was tacitly understood that bills of lading for the shipments would be subsequently issued to the shippers, but nothing whatever was said respecting the terms and conditions thereof.

After the goods had been received on board and the propeller had departed on her voyage, the respondent delivered to the shippers respectively bills of lading, each of which described the goods as shipped on the propeller Merchant, and addressed to the owners by name at their ultimate destination ; fixed the rate of freight from Chicago to that destination ; and contained an agreement that the goods should be "transported by the Anchor Line, and the steamboats, railroad companies and forwarding lines with which it connects, until the said goods shall have reached the point named in the bill of lading, on the following terms and conditions," among which were these :

"The said Anchor Line, and the steamboats, railroad companies and forwarding lines with which it connects, and which receive said property, shall not be liable" "for loss or damage

by fire, collision, or the dangers of navigation while on seas, bays, harbors, rivers, lakes or canals. And where grain is shipped in bulk, the said Anchor Line is hereby authorized to deliver the same to the Elevator Company at Erie, as the agent of the owner or consignee, for transshipment (but without further charge to such owner and consignee) into the cars of the connecting railroad companies or forwarding lines; and when so transshipped in bulk, the said Anchor Line and the said connecting railroad company or carrier shall be and is, in consideration of so receiving the same for carriage, hereby exempted and released from all liability for loss, either in quantity or weight, and shall be entitled to all other exemptions and conditions herein contained."

"It is further agreed that the Anchor Line, and the steamboats, railroads and forwarding lines with which it connects, shall not be held accountable for any damage or deficiency in packages, after the same shall have been receipted for in good order by consignees or their agents, at or by the next carrier beyond the point to which this bill of lading contracts."

"It is further stipulated and agreed that in case of any loss, detriment or damage, done to or sustained by any of the property herein receipted for, during such transportation, whereby any legal liability or responsibility shall or may be incurred, that company alone shall be held answerable therefor in whose actual custody the same may be at the time of the happening of such loss, detriment or damage; and the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods."

"And it is further agreed that the amount of the loss or damage so accruing, so far as it shall fall upon the carriers above described, shall be computed at the value or cost of said goods or property at the place and time of shipment under this bill of lading."

These bills of lading were received by the shippers without protest or objection, and were signed by Elmendorf & Co. and by Wolcott & Co., but not by A. M. Wright & Co.

The bills of lading were received by the shippers without specially reading the terms and conditions, their attention was

not directed to them, nor was anything said respecting them; and no reduction of freight from the rate stipulated in the oral agreement was made in consequence of those terms and conditions, or other consideration paid therefor; but the shippers had often before shipped goods by this line under similar contracts, and thereby knew, or had every opportunity of knowing, the contents of these bills of lading.

The propeller completed the lading of the goods during the evening of July 24, 1874, and about midnight departed on her voyage. About ten o'clock the next morning, in a dense fog, she was stranded on the western shore of Lake Michigan, about ten miles south of Milwaukee, through the negligence of those managing her, and immediately filled with water, and all the grain became wet and damaged; 1200 bushels of it were thrown overboard to get off the vessel; and 5188 bushels were brought into Milwaukee in a perishable condition, and were there sold for the sum of $1037.60, which was retained by the respondent.

On said 24th of July, the libellant, a New York corporation, authorized to transact a general lake and insurance business, insured the shippers, at their request and expense, against loss or damage to these shipments from perils of the seas and other perils; and issued to them certificates of insurance, for $8000, $520 and $700, respectively, in this form:

"No. 627. The Phœnix Insurance Company, New York. $8000. Chicago, July 24, 1874. This certifies that A. M. Wright & Co. [are] insured, under and subject to the conditions of open policy No. 2263 of the Phœnix Insurance Company, in the sum of eight thousand dollars, on corn on board the propeller Merchant, at and from Chicago to Erie. Loss payable to assured, order hereon, and return of this certificate.

"CHAS. E. CHASE, Agent."

The policy of insurance, referred to in these certificates, insured "Charles E. Chase, on account of whom it may concern," "lost or not lost, at and from ports and places to ports and places, on cargo, premiums to be settled monthly, upon all kinds

of lawful goods and merchandise laden or to be laden on board " any vessel or vessels; and was otherwise in the usual form of an open policy of insurance for $1,000,000 against marine risks, including perils of the seas, " barratry of the master and mariners, and all other perils, losses and misfortunes that have or, shall come to the hurt, detriment or damage of the said goods and merchandises or any part thereof;" and contained these provisions: "The company are to be entitled to premium at their usual rates on all shipments reported or not. It is warranted by the assured to report every shipment on the day of receiving advices thereof, or as soon thereafter as may be practicable, when the rate of premium shall be fixed by the president or the vice-president of the company." "No shipment to be considered as insured until approved and endorsed on this policy by C. E. Chase, agent."

The shipments were duly approved and endorsed on the policy. On August 19, 1874, the shippers abandoned the goods to the libellant as a total loss, by written instruments, substantially alike, the material part of the one executed by A. M. Wright & Co. being as follows:

"Chicago, August 19, 1874. For and in consideration of the sum of eight thousand dollars, the receipt whereof is hereby acknowledged, we do by these presents assign, transfer, cede and abandon to the Phoenix Insurance Company all our right, title and interest in and to the property hereinafter specified, and to all that can or may in any way be made, saved or realized from the damage or loss, reported to have occurred, by reason of which a claim of payment has been made by us, with full power to take and use all lawful ways and means (at the risk and expense of the Phoenix Ins. Co.) to make, save and realize the said property, to wit, 16,325.34 bushels of corn, as per bill of lading and invoice, shipped on board the propeller Merchant, bound from Chicago for Erie, and covered by insurance with the Phoenix Ins. Co., by open policy No. 2263, certificate No. 627, under date of July 24, 1874."

In consequence thereof, the libellant paid to the shippers the amount of the insurance as and for a constructive total loss.

A general average adjustment was made on September 2, 1884, and readjusted on February 1, 1875, awarding to the libellant the sum of $2466.12 on account of these shipments.

The Circuit Court made and stated the following conclusions of law : 1. That the bills of lading were the contracts by which the rights of the parties were to be governed. 2. That under them the respondent became liable to the shippers for the value of the shipments, by reason of the negligent loss of the same, and that the shippers had rights of action therefor. 3. That by the abandonments, the libellant did not succeed to those rights of action of the shippers, by reason of the stipulation contained in the bills of lading, that "the carrier so liable shall have the full benefit of any insurance that may have been effected upon or on account of said goods." 4. That the libellant was entitled to recover the sum of $2466.12, awarded to it in the general average adjustment readjusted as aforesaid, with interest thereon.

The Circuit Court entered a decree for the libellant for this sum only, and the libellant appealed to this court.

*Mr. George D. Van Dyke* for appellant (*Mr. George A. Black* also filed a brief for same), cited, in the divisions of his argument under the following general heads, cases as follows: As to the legal effect of the abandonments, *Chesapeake Insurance Co.* v. *Stark,* 6 Cranch, 268 ; *Columbian Insurance Co.* v. *Ashby,* 4 Pet. 139 ; *Patapsco Insurance Co.* v. *Southgate,* 5 Pet. 604 ; *Comegys* v. *Vasse,* 1 Pet. 193 ; *Union Insurance Co.* v. *Burrell,* Anthon N. P. 128 ; *Mellon* v. *Bucks,* 5 Martin La. N. S. 371 ; *Rogers* v. *Hosack,* 18 Wend. 319 ; *Mutual Insurance Co.* v. *Cargo of the George,* Olcott Adm. 89 ; *The Monticello,* 17 How. 152 ; *The Manistee,* 5 Bissell, 381 ; *S. C.,* 7 Bissell, 35 ; *Bradlie* v. *Maryland Insurance Co.,* 12 Pet. 378 ; *Columbian Insurance Co.* v. *Catlett,* 12 Wheat. 383 ; *Union Insurance Co.* v. *Scott,* 1 Johns. 106 ; *Smith* v. *Manufacturing Co.,* 7 Met. (Mass.) 448, 453 ; *Sun Mutual Insurance Co.* v. *Hall,* 104 Mass. 507 ; *Stewart* v. *Greenock Insurance Co.,* 2 H. L. Cas. 159 ; *Garrison* v. *Memphis Insurance Co.,* 19 How. 312 ; *Hall & Long* v. *Railroad Cos.,* 13 Wall. 367 ;

*Mobile & Montgomery Railway* v. *Jurey*, 111 U. S. 584; *The Atlas*, 93 U. S. 302; *The Potomac*, 105 U. S. 630; *Ins. Co.* v. *Stinson*, 103 U. S. 25: That the carrier had notice of assured's right of abandonment and the legal effect thereof, from the derivation of its title, *Sheppard* v. *Taylor*, 5 Pet. 675: That the assured could not impair the rights of the insurer under the abandonments by dealing with one charged with notice thereof, *Welch* v. *Mandeville*, 1 Wheat. 233; *Andrews* v. *Beecker*, 1 Johns. Cas. 411 and note to 2d ed.; *Hart* v. *Western Railroad Co.*, 13 Met. (Mass.) 99; *Monmouth Ins. Co.* v. *Hutchinson*, 6 C. E. Green (21 N. J. Eq.), 107; *Connecticut Insurance Co.* v. *Erie Railway Co.*, 73 N. Y. 399; *Steele* v. *Franklin Insurance Co.*, 17 Penn. St. 290; *Atlantic Insurance Co.* v. *Storrow*, 1 Edw. Ch. 621; *Foster* v. *Van Reed*, 70 N. Y. 19; *Carpenter* v. *Providence Insurance Co.*, 16 Pet. 495; *Bank of South Carolina* v. *Bicknell*, 1 Cliff. 85: That a common carrier cannot contract for the benefit of the shipper's insurance to protect him against his own negligence, *Bank of Kentucky* v. *Adams Express Co.*, 93 U. S. 174; *Caldwell* v. *Express Co.*, 21 Wall. 266; *Railroad Co.* v. *Pratt*, 22 Wall. 123; *Railway Co.* v. *Stevens*, 95 U. S. 655; *Hart* v. *Pennsylvania Railroad Co.*, 112 U. S. 331; *The Hadji*, 20 Fed. Rep. 875; *S. C.*, 16 Fed. Rep. 861; *The Titania*, 19 Fed. Rep. 101; *Peek* v. *N. S. R. Co.*, 10 H. L. C. 473; *Cincinnati Railway Co.* v. *Spratt*, 2 Duval, 4; *Candee* v. *Western Union Tel. Co.*, 34 Wisc. 471; *Home Insurance Co.* v. *Baltimore Warehouse Co.*, 93 U. S. 527; *Hooper* v. *Robinson*, 98 U. S. 528; *The Sidney*, 23 Fed. Rep. 88; *Waters* v. *Monarch Assurance Co.*, 5 El. & Bl. 870; *London & Northwestern Railway Co.* v. *Glyn*, 1 El. & Bl. 652; *North British Insurance Co.* v. *London & Globe Insurance Co.*, 5 Ch. D. 569; *Darrell* v. *Tibbitts*, 5 Q. B. D. 560; *Joyce* v. *Kennard*, L. R. 7 Q. B. 78; *Mutual Insurance Co.* v. *Sherwood*, 14 How. 351, 367–8; *Mathews* v. *Howard Insurance Co.*, 1 Kern. 1; *McQuirk* v. *The Penelope*, 2 Pet. Adm. 276; *Phœnix Insurance Co.* v. *Cochran*, 51 Penn. St. 143; *Citizens Insurance Co.* v. *Marsh*, 4 Penn. St. 386; *Walker* v. *Maitland*, 5 B. & Ald. 171; *Crowley* v. *Cohen*, 5 B. & Ad. 478; *Van Natta* v. *Security Insurance Co.*, 2 Sandf. Super. Ct. 490;

*Savage* v. *Corn Exchange Insurance Co.,* 36 N. Y. 655: As to whether the assured had defeated the abandonments by the stipulation in the bill of lading respecting the benefit of insurance, *The Adriatic,* 107 U. S. 512; *The Benefactor,* 102 U. S. 214; *Sun Mutual* v. *Ocean Insurance Co.,* 107 U. S. 485; *Barnes* v. *Williams,* 11 Wheat. 415; *Hodges* v. *Easton,* 106 U. S. 408; *Bostwick* v. *Baltimore & Ohio Railroad,* 45 N. Y. 712; *Baker* v. *Michigan Southern Railroad,* 42 Ill. 73; *Strohn* v. *Detroit & Milwaukee Railway Co.,* 21 Wisc. 554; *Detroit & Milwaukee Railroad Co.* v. *Adams,* 15 Mich. 458; *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 How. 344; *York Co.* v. *Central Railroad,* 3 Wall. 111; *Railroad Co.* v. *Manufacturing Co.,* 16 Wall. 318; *Insurance Co.* v. *Railroad Co.,* 104 U. S. 146; *Western Transportation Co.* v. *Newhall,* 24 Ill. 466; *Illinois Central Railroad Co.* v. *Smyser,* 38 Ill. 354; *Erie & Western Transportation Co.* v. *Dater,* 91 Ill. 195; *Merchants' Dispatch* v. *Theilbar,* 86 Ill. 71; *Hoadley* v. *Northern Transportation Co.,* 115 Mass. 304; *The Delaware,* 14 Wall. 579; *Scudder* v. *Union Bank,* 91 U. S. 406; *Pope* v. *Nickerson,* 3 Story, 484; *Maynard* v. *Syracuse & Binghamton Railroad,* 71 N. Y. 180; *Holsapple* v. *Rome & Watertown Railroad,* 86 N. Y. 275; *Christmas* v. *Russell,* 14 Wall. 69; *Dillon* v. *Barnard,* 21 Wall. 430; *Removal Cases,* 100 U. S. 457; *Minturn* v. *Manufacturing Insurance Co.,* 10 Gray, 501; *Stearns* v. *Quincy Insurance Co.,* 124 Mass. 61; *Swain* v. *Seamens,* 9 Wall. 254; *Flanigan* v. *Turner,* 1 Black, 491; *King* v. *Fowler,* 16 Mass. 397; *Charles* v. *Altin,* 15 C. B. 46; *Alston* v. *Herring,* 11 Ex. 822; *Willard* v. *Dorr,* 3 Mason, 161.

*Mr. George B. Hibbard* for appellee.

MR. JUSTICE GRAY, after stating the case as above reported, delivered the opinion of the court.

It being found as matter of fact that the lading of the goods on board the propeller was not completed until the evening of the 24th of July, that she departed on her voyage about midnight, and that the bills of lading were not delivered by

the carrier to the shippers until after her departure, it is clear
that the bills of lading were not actually delivered until the
25th. But it being also found that oral agreements for the
carriage were made on the 24th, with the understanding that
bills of lading would be subsequently issued ; and that the
shippers, having often before shipped goods by this line under
similar bills of lading, knew or had every opportunity of know-
ing their terms and conditions; it is also clear that the bills of
lading were but a putting in form of the oral agreements made
on the 24th, and took effect as if they had been delivered and
accepted on that day.

The certificates of the agent of the insurance company,
without which the policy of insurance did not attach to these
goods, were also made on that day, and described the goods
as on board the propeller. The contract of carriage and the
contract of insurance must therefore be treated as substantially
contemporaneous, and both made before the loss of the goods.
There is nothing to show any misrepresentation or intentional
concealment by the assured in obtaining the insurance, or that
the insurer had or had not knowledge or notice of the usual
form of the bills of lading.

The policy of insurance contains no express stipulation for
the assignment to the insurer of the assured's right of action
against third persons. In the bills of lading, it is expressly
stipulated that the carriers, whose railroad or vessels form part
of the line of transportation, shall not be liable for loss or
damage by fire, collision, or dangers of navigation; and that
each carrier shall be liable only for a loss of the goods while in
its custody, "and the carrier so liable shall have the full bene-
fit of any insurance that may have been effected upon or on
account of said goods."

The question is, whether under these circumstances the
insurer, upon payment of a loss, became subrogated to the
right to recover damages from the carrier.

When goods insured are totally lost, actually or constructively,
by perils insured against, the insurer, upon payment of the loss,
doubtless becomes subrogated to all the assured's rights of action
against third persons who have caused or are responsible for

the loss. · No express stipulation in the policy of insurance, or abandonment by the assured, is necessary to perfect the title of the insurer. From the very nature of the contract of insurance as a contract of indemnity, the insurer, when he has paid to the assured the amount of the indemnity agreed on between them, is entitled, by way of·salvage, to the benefit of anything that may be received, either from the remnants of the goods, or from damages paid by third persons for the same loss. But the insurer stands in no relation of contract or of privity with such persons. His title arises out of the contract of insurance, and is derived from the assured alone, and can only be enforced in the right of the latter. In a court of common law, it can only be asserted in his name, and, even in·a court of equity or of admiralty, it can only be asserted in his right. In any form of remedy, the insurer can take nothing by subrogation but the rights of the assured. · *Comegys* v.· *Vasse,* 1 Pet. 193, 214; *Fretz* v. *Bull,* 12 How. 466, 468; *The Monticello,* 17 How. 152, 155; *Garrison* v. *Memphis Ins. Co.,* 19 How. 312, 317; *Hall* v. *Railroad Cos.,* 13 Wall. 367, 370, 371; *The Potomac,* 105 U. S. 630, 634, 635; *Mobile & Montgomery Railway* v. *Jurey,* 111 U.S. 584, 594; *Clark* v. *Wilson,* 103 Mass. 219; *Simpson* v. *Thomson,* 3 App. Cas. 279, 286, 292, 293. That the right of the assured to recover damages against a third· person is not incident to the property in the thing insured, but only a personal right of the assured, is clearly shown by the fact that the insurer acquires a beneficial interest in that right of action, in proportion to the sum paid by him, not only in the case of a total loss, but likewise in the case of a partial loss, and when no interest in the property is abandoned or accrues to him. *Hall* v. *Railroad Cos.,* *The Potomac,* and *Simpson* v. *Thomson,* above cited.

The right of action against another person, the equitable interest in which passes· to the insurer, being only that which the assured has, it follows that if the assured has no such right of action, none passes to the insurer; and that if the assured's right of action is limited or restricted by lawful contract between him and the person sought to be made responsible for the loss, a suit by the insurer, in the right of the assured, is subject to like limitations or restrictions.

For instance, if two ships, owned by the same person, come into collision by the fault of the master and crew of the one ship and to the injury of the other, an underwriter who has insured the injured ship, and received an abandonment from the owner, and paid him the amount of the insurance as and for a total loss, acquires thereby no right to recover against the other ship, because the assured, the owner of both ships, could not sue himself. *Simpson* v. *Thomson,* above cited; *Globe Ins. Co.* v. *Sherlock,* 25 Ohio St. 50, 68.

Upon the same principle, any lawful stipulation between the owner and the carrier of the goods, limiting the risks for which the carrier shall be answerable, or the time of making the claim, or the value to be recovered, applies to any suit brought in the right of the owner, for the benefit of his insurer, against the carrier; as, for instance, if the contract of carriage expressly exempts the carrier from liability for losses by fire; *York Co.* v. *Central Railroad,* 3 Wall. 107; or requires claims against the carrier to be made within three months; *Express Co.* v. *Caldwell,* 21 Wall. 264; or fixes the value for which the carrier shall be responsible; *Hart* v. *Pennsylvania Railroad,* 112 U. S. 331. So the stipulation, not now in controversy, in the bills of lading in the present case, making the value of the goods at the place and time of shipment the measure of the carrier's liability, would control, although in the absence of such a stipulation the carrier would be liable for the value at the place of destination, as held in *Mobile & Montgomery Railway* v. *Jurey,* 111 U. S. 584.

The stipulation in these bills of lading, that the carriers "shall not be liable for loss or damage by fire, collision, or the dangers of navigation," clearly does not protect them from liability for any loss occasioned by their own negligence. By the settled doctrine of this court, even an express stipulation in the contract of carriage, that a common carrier shall be exempt from liability for losses caused by the negligence of himself and his servants, is unreasonable and contrary to public policy, and therefore void. *Railroad Co.* v. *Lockwood,* 17 Wall. 357; *Railroad Co.* v. *Pratt,* 22 Wall. 123; *Bank of Kentucky* v. *Adams Express Co.,* 93 U. S. 174; *Railway Co.* v. *Stevens,* 95

U. S. 655. And it may be that, as held by Judge Wallace in a case in the Circuit Court, a stipulation that "no damage that can be insured against will be paid for" would not protect the carrier from liability for his own negligence, because that would be to compel the owners of the goods to insure against the negligence of the carrier. *The Hadji*, 22 Blatchford, 235.

But the stipulation upon the subject of insurance, in the bills of lading before us, is governed by other considerations. It does not compel the owner of the goods to stand his own insurer, or to obtain insurance on the goods; nor does it exempt the carrier, in case of loss by negligence of himself or his servants, from liability to the owner, to the same extent as if the goods were uninsured. It simply provides that the carrier, when liable for the loss, shall have the benefit of any insurance effected upon the goods.

It is conclusively settled, in this country and in England, that a policy of insurance, taken out by the owner of a ship or goods, covers a loss by perils of the sea or other perils insured against, although occasioned by the negligence of the master or crew or other persons employed by himself. *Waters* v. *Merchants' Louisville Ins. Co.*, 11 Pet. 213; *Copeland* v. *New England Ins. Co.*, 2 Met. 432; *General Ins. Co.* v. *Sherwood*, 14 How. 351, 366; *Davidson* v. *Burnand*, L. R. 4 C P. 117, 121.

Any one who has made himself responsible for the safety of goods has a sufficient interest in them to enable him to obtain insurance upon them.

Contracts of reinsurance, by which one insurer causes the sum which he has insured to be reassured to him by a distinct contract with another insurer, with the object of indemnifying himself against his own responsibility, (though prohibited for a time in England by statute,) are valid by the common law, and have always been lawful in this country; and in a suit upon such a contract, the subject at risk and the loss thereof must be proved in the same manner as if the original assured were the plaintiff. 3 Kent Com. 278, 279; *Sun Ins. Co.* v. *Ocean Ins. Co.*, 107 U. S. 485; *Mackenzie* v. *Whitworth*, L. R. 10 Ex. 142, and 1 Ex. D. 36.

So a common carrier, a warehouseman, or a wharfinger,

whether liable by law or custom to the same extent as an insurer, or only for his own negligence, may, in order to protect himself against his own responsibility, as well as to secure his lien, cause the goods in his custody to be insured to their full value, and the policy need not specify the nature of his interest. *Crowley* v. *Cohen*, 3 B. & Ad. 478; *De Forest* v. *Fulton Ins. Co.*, 1 Hall 84, 110; *Waters* v. *Monarch Assurance Co.*, 5 El. & Bl. 870; *London & Northwestern Railway* v. *Glyn*, 1 El. & El. 652; *Savage* v. *Corn Exchange Ins. Co.*, 36 N. Y. 655; *Joyce* v. *Kennard*, L. R. 7 Q. B. 78; *Commonwealth* v. *Shoe & Leather Ins. Co.*, 112 Mass. 131; *Home Ins. Co.* v. *Baltimore Warehouse Co.*, 93 U. S. 527; *North British Ins. Co.* v. *London, Liverpool & Globe Ins. Co.*, 5 Ch. D. 569.

No rule of law or of public policy is violated by allowing a common carrier, like any other person having either the general property or a peculiar interest in goods, to have them insured against the usual perils, and to recover for any loss from such perils, though occasioned by the negligence of his own servants. By obtaining insurance, he does not diminish his own responsibility to the owners of the goods, but rather increases his means of meeting that responsibility. If it were true that a ship owner, obtaining insurance by general description upon his ship and the goods carried by her, could, in case of the loss of both ship and goods, by perils insured against, and through the negligence of the master and crew, recover of the insurers for the loss of the ship only, and not for the loss of the goods, some trace of the distinction would be found in the books. But the learning and research of counsel have failed to furnish any such precedent.

On the contrary, in one of the earliest cases in which the rule that a policy of insurance covers losses by perils insured against, though occasioned by the negligence of the servants of the assured, was judicially affirmed; the assured, being the owner of a ship, had chartered her for a West India voyage, and by the usages of trade bore the risk of bringing the cargo from the shore to the ship; the policy was upon the boats of the ship, and upon goods in them; and the amount recovered of the insurer was for goods being carried from the shore to the ship in

her boats, and lost by the wrecking of the boats in consequence of the misconduct and negligence of some of the ship's crew. Such was the state of facts to which Lord Chief Justice Abbott applied the language, cited and approved by Mr. Justice Story in *Waters* v. *Merchants' Louisville Ins. Co.,* 11 Pet. 222, and by Chief Justice Shaw in *Copeland* v. *New England Ins. Co.,* 2 Met. 442: "In this case, the immediate cause of the loss was the violence of the winds and waves. No decision can be cited, where, in such a case, the underwriters have been held to be excused in consequence of the loss having been remotely occasioned by the negligence of the crew. I am afraid of laying down any such rule; it will introduce an infinite number of questions as to the quantum of care which, if used, might have prevented the loss. Suppose, for instance, the master were to send a man to the mast-head to look out, and he falls asleep, in consequence of which the vessel runs upon a rock, or is taken by the enemy, in that case it might be argued, as here, that the loss was imputable to the negligence of one of the crew, and that the underwriters were not liable. These, and a variety of other such questions, would be introduced, in case our opinion were in favor of the underwriters." *Walker* v. *Maitland,* 5 B. & Ald. 171, 174, 175.

So in the recent case of *North British Ins. Co.* v. *London, Liverpool & Globe Ins. Co.,* it was assumed, as unquestionable, that insurance obtained by a wharfinger would cover a loss by his own negligence. 5 Ch. D. 569, 584.

As the carrier might lawfully himself obtain insurance against the loss of the goods by the usual perils, though occasioned by his own negligence, he may lawfully stipulate with the owner to be allowed the benefit of insurance voluntarily obtained by the latter. This stipulation does not, in terms or in effect, prevent the owner from being reimbursed the full value of the goods; but being valid as between the owner and the carrier, it does prevent either the owner himself, or the insurer, who can only sue in his right, from maintaining an action against the carrier upon any terms inconsistent with this stipulation.

Nor does this conclusion impair any lawful rights of the

insurer.   His right of subrogation, arising out of the contract of insurance and payment of the loss, is only to such rights as the assured has, by law or contract, against third persons.   The policy containing no express stipulation upon the subject, and there being no evidence of any fraudulent concealment or misrepresentation by the owner in obtaining the insurance, the existence of the stipulation between the owner and the carrier would have afforded no defence to an action on the policy, according to two careful judgments rendered in June last and independently of each other, the one by the English Court of Appeal, and the other by the Supreme Judicial Court of Massachusetts.   *Tate* v. *Hyslop*, 15 Q. B. D. 368; *Jackson Co.* v. *Boylston Ins. Co.*, 139 Mass. 508.

In *Tate* v. *Hyslop*, owners of goods, insured against risks in crafts or lighters, had previously agreed with a lighterman that he should not be liable for any loss in crafts except loss caused by his own negligence, and did not disclose this agreement to the underwriters at the time of procuring the insurance.   The sole ground on which it was held that the owners could not recover on the policy was that this agreement was material to the risk, because the underwriters, as the assured knew, had previously established two rates of premium, depending on the question whether they would have recourse over against the lighterman.   Lord Justice Brett observed that, but for the two rates of premium established by the underwriters and known to the assured, the omission of the assured to disclose their agreement with the lighterman could only have affected the amount of salvage which the underwriters might have, and would have been immaterial to the risk, and consequently to the insurance.   15 Q. B. D. 375, 376.

In *Jackson Co.* v. *Boylston Ins. Co.*, it was adjudged that, in the absence- of. any fraud or intentional concealment, the undisclosed existence of 'a stipulation between the assured and the carrier, like .that now before us, afforded no defence to an action on the policy.

It may be added that our conclusion accords with the decision of Judge Shipman in *Rintoul* v. *New York Central Railroad*, 21 Blatchford, 439, as well as with those of Judge Dyer

in the District Court, and Judge Drummond in the Circuit Court, in the present case. 10 Bissell, 18, 38. See also *Carstairs* v. *Mechanics' & Traders' Ins. Co.*, 18 Fed. Rep. 473; *The Sidney*, 23 Fed. Rep. 88; *Mercantile Ins. Co.* v. *Calebs*, 20 N. Y. 173.

*Decree affirmed.*

MR. JUSTICE BRADLEY dissented.